1  DAVID G. WILLE (*Pro Hac Vice*) (TX Bar No. 08945388)
2  JEFFERY D. BAXTER (*Pro Hac Vice*) (TX Bar No. 24006816)
   AARON DAVIDSON (*Pro Hac Vice*) (TX Bar No. 24007080)
3  SAMIR A. BHAVSAR (*Pro Hac Vice*) (TX Bar No. 00798065)
   BAKER BOTTS L.L.P.
4  2001 Ross Avenue
   Dallas, Texas 75201
5  Telephone: (214) 953-6500
   Facsimile: (214) 953-6503
6  E-mail: david.wille@bakerbotts.com
7  E-mail: jeff.baxter@bakerbotts.com
   E-mail: aaron.davidson@bakerbotts.com
8  E-mail: samir.bhavsar@bakerbotts.com

9  STEPHEN E. TAYLOR (SBN 058452)
10 JONATHAN A. PATCHEN (SBN 237346)
   CHRISTOPHER A. WIMMER (SBN 263275)
11 TAYLOR & COMPANY LAW OFFICES, LLP
   One Ferry Building, Suite 355
12 San Francisco, California 94111
   Telephone: (415) 788-8200
13 Facsimile: (415) 788-8208
   E-mail: staylor@tcolaw.com
14 E-mail: jpatchen@tcolaw.com
   E-mail: cwimmer@tcolaw.com
15

16 Attorneys for Plaintiff
   INFINEON TECHNOLOGIES AG
17

   UNITED STATES DISTRICT COURT
18
   NORTHERN DISTRICT OF CALIFORNIA
19
   SAN FRANCISCO DIVISION
20

21 INFINEON TECHNOLOGIES AG, a            Case No. CV-11-06239 (MMC) (DMR)
   German corporation,
22                                        **PLAINTIFF INFINEON'S OPENING CLAIM**
23                 Plaintiff,             **CONSTRUCTION BRIEF**
           vs.
24                                        Date:    May 19, 2014
   VOLTERRA SEMICONDUCTOR                 Time:    9:00 AM
25 CORPORATION, a Delaware corporation,   Dept.:   Courtroom 7 - 19th Floor
                                          Judge:   Honorable Maxine M. Chesney
26                 Defendant.
                                          **REDACTED VERSION OF DOCUMENT**
27                                        **SOUGHT TO BE SEALED**
28

---

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

OVERVIEW OF THE ASSERTED PATENT ........................................................ 1

STATEMENT OF THE LAW ON CLAIM CONSTRUCTION ............................ 2

VOLTERRA'S EXPERT TESTIMONY ................................................................ 4

ARGUMENT ........................................................................................................... 5

I.     "metal conductors" ....................................................................................... 5

     A.     The term "metal conductor" does not require construction because the term
           should be given its plan and ordinary meaning—a metal that conducts. ............... 5

     B.     Volterra's proposed construction should be rejected because it improperly
           imports limitations inconsistent with the plain meaning of "metal
           conductor." ................................................................................................. 6

     C.     Dr. Szepesi's additional limitations should be rejected because they are
           inconsistent with the '730 Patent and both sides' proposed constructions. ............. 7

          1.     The metal conductors are not limited to aluminum. .................................... 7

          2.     The patentees did not disclaim any portion of the plain meaning of
              "metal conductor" and certainly did not disclaim the use of UBM. ............. 9

II.    "bump" ......................................................................................................... 12

     A.     The term "bump" should be given its plain and ordinary meaning—a raised
           metal contact. ............................................................................................. 13

     B.     Volterra's proposed construction should be rejected because it improperly
           reads a particular method of manufacture into the claims and is inconsistent
           with the plain meaning of "bump." ........................................................... 13

     C.     Dr. Szepesi's additional limitations should be rejected because they are
           inconsistent with the '730 Patent and both sides' proposed constructions. .......... 15

III.   "frame" ........................................................................................................ 16

     A.     The term "frame" should be given its plain and ordinary meaning, which is
           a lead frame. ............................................................................................. 16

     B.     Volterra's proposed requirement that the frame include "other portions for
           connecting to a PCB" should be rejected because it is inconsistent with the
           claim language and the specification of the '730 Patent. ........................... 17

1               1.  Volterra's construction is inconsistent with Claim 1. ............................... 17

2               2.  The specification does not redefine the term "frame" by

3                  lexicography or disclaimer to require "other portions for connecting
           to a PCB." ............................................................................................. 18

4     IV.  "connection portions".................................................................................. 20

5

6          A.  The Court should adopt Infineon's proposed construction of "connection
               portion" because it is the only proposal that clarifies the scope of the claim. ...... 20

7     V.   "interdigitated"............................................................................................. 22

8     VI.  "bumps on the first metal conductors are substantially aligned in first lines which

9          extend in a second direction" and "bumps on the second metal conductors are
           substantially aligned in second lines which extend in the second direction" .................. 23

10

11         A.  The Claim 5 limitations do not require any further construction.......................... 23

12         B.  Volterra's proposed construction should be rejected because it incorporates
               limitations inconsistent with the claim language and specification..................... 23

13

14         C.  Dr. Szepesi's attempt to read into Claim 5 a requirement that the
               connection portions be aligned in the second direction is improper and
               inconsistent with both sides' constructions............................................................ 25

15

16    CONCLUSION ................................................................................................. 25

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AFG Industries, Inc. v. Cardinal IG Co.*,
   375 F.3d 1367 (Fed. Cir. 2004)..........................................................................14

*Altiris, Inc. v. Symantec Corp.*,
   318 F.3d 1363 (Fed. Cir. 2003)............................................................................4

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
   340 F.3d 1298 (Fed. Cir. 2003)..........................................................................15

*Applied Signal Tech., Inc. v. Emerging Mkts. Comm., Inc.*,
   No. C 09-2180 SBA, 2011 WL 500786 (N.D. Cal. Feb. 9, 2011)........................23

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002)............................................................................8

*DESA IP, LLC v. EML Technologies, LLC*,
   211 F. App'x 932 (Fed. Cir. 2007) ......................................................................4

*E-Pass Techs., Inc. v. 3Com Corp.*,
   343 F.3d 1364 (Fed. Cir. 2003)....................................................................11, 12

*Epistar Corp. v. Int'l Trade Comm'n*,
   566 F.3d 1321 (Fed. Cir. 2009)......................................................................3, 10

*In re Mouttet*,
   686 F.3d 1322 (Fed. Cir. 2012)............................................................................9

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001)............................................................................2

*Kara Tech. Inc. v. Stamps.com Inc.*,
   582 F.3d 1341 (Fed. Cir. 2009)............................................................3, 4, 9, 15

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004)............................................................................24

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)..........................................................1, 2, 4, 24, 25

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
   329 F.3d 823 (Fed. Cir. 2003)............................................................................12

*Superguide Corp. v. DirecTV Enters., Inc.*,
    358 F.3d 870 (Fed. Cir. 2004) ................................................................................ 8

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ............................................................................. 3

*Thorner v. Sony Computer Entm't Am.*,
    669 F.3d 1362 (Fed. Cir. 2012) ............................................................ 3, 5, 7, 9, 10

*Toshiba Corp. v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012) .......................................................................... 3, 6

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ....................................................................... 17, 21

*Vanguard Products Corp. v. Parker Hannifin Corp.*,
    234 F.3d 1370 (Fed. Cir. 2001) ........................................................................... 14

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ......................................................................... 4, 24

*Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999) ............................................................................. 17

*Woods v. DeAngelo Marine Exhaust, Inc.*,
    692 F.3d 1272 (Fed. Cir. 2012) .......................................................................... 3, 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
## INTRODUCTION

2      The key claim terms in dispute are simple and straightforward and should simply be given

3   their plain and ordinary meaning, as reflected in Infineon's proposed constructions.  Volterra

4   attempts to escape liability for its infringing products by ascribing narrow meanings to the broad

5   terms the patentees used in drafting the claims.  To support its view, Volterra relies heavily on its

6   proffered expert Dr. Szepesi and on the examples described in the patent's specification.

7   Volterra's restrictive constructions violate the basic tenet of patent law that the claims—not the

8   example embodiments described in the specification or the testimony of a litigation expert—

9   define the scope of the patented invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed.

10  Cir. 2005) (en banc).

11
## OVERVIEW OF THE ASSERTED PATENT

12     U.S. Patent No. 5,945,730 ("the '730 Patent") relates to a "semiconductor power device."

13  Ex. 1, '730 Patent, 1:1-5, 2:8-11.  The patent primarily concerns packaging technology—how to

14  provide external electrical connections to the semiconductor device.  Ex. 3, Ex. 3, Schaper Reb.

15  Decl. ¶ 1.  One of the objectives of the invention is to reduce the resistance of the power device,

16  enabling the device to more efficiently handle applications requiring large amounts of electrical

17  current flowing through the device.  '730 Patent, 1:16-27, 1:56-58.  In particular, the patent

18  explains that prior art devices made external connections using wire-bonds to pads along the

19  periphery of the device.  '730 Patent, 1:8-15.  Because current has to flow the length of the

20  device, these devices have a high on-resistance.  '730 Patent, 1:16-19.  By contrast, the invention

21  involves using bumps to form interconnection to a lead frame that extends over the

22  semiconductor die.  *See, e.g.*, '730 Patent, 2:46-50.

23     For example, Figures 1 and 2 illustrate preferred embodiments of the invention.  The

24  device includes an array of bumps over the surface of the semiconductor die and a frame that

25  extends over the semiconductor die to connect to the bumps.  Figure 1 depicts part of the

26  semiconductor die of a LDMOS power transistor, showing bumps arranged on metal conductors.

27  Figure 2 depicts part of the frame of the LDMOS power transistor.  As shown in the figures

28  below, the frame has connecting portions (labeled 16 and 18) that align with the bumps (labeled

8) on the metal conductors of the device (labeled 4 and 6) when one is placed on top of the other. As a result, "[w]hen the LDMOS transistor device is assembled, the frame extends over the metal conductors 4 and 6 of the LDMOS transistor die so that the connecting portions 16, 18 are connected to the respective metal conductors via the respective bumps." '730 Patent, 3:13-17.



The specification teaches that this packaging technology, which connects a frame to bumps over the surface of the device rather than connecting wire-bonds to pads at the periphery, lowers the on-resistance of the device by reducing the distance that the electrical current must travel. Ex. 2, Ex. 2, Schaper Op. Decl. ¶¶ 55, 73; '730 Patent, 4:37-57. "This significant reduction in the device resistance ensures that the power device in accordance with the present invention can sustain higher currents . . . for the same power level (or transistor area) compared to the prior art arrangements." '730 Patent, 4:50-54.

## STATEMENT OF THE LAW ON CLAIM CONSTRUCTION

"It is a bedrock principle of patent law that the claims of a patent define the invention" and thus the scope of the patentee's exclusionary rights. *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted). Therefore, "[i]n construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim" the invention. *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).

That claim language is "generally given [its] ordinary and customary meaning as

1  understood by a person of ordinary skill in the art when read in the context of the specification."

2  *Thorner v. Sony Computer Entm't Am.*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "There are only

3  two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own

4  lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the

5  specification or during prosecution." *Id.*; *see also Toshiba Corp. v. Imation Corp.*, 681 F.3d

6  1358, 1369 (Fed. Cir. 2012) ("Absent disclaimer or lexicography, the plain meaning of the claim

7  controls.").

8      The standards that trigger these exceptions are exacting: a disclaimer of claim scope must

9  be "clear and unmistakable." *Thorner*, 669 F.3d at 1366-67; *see also Teleflex, Inc. v. Ficosa N.*

10  *Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("The patentee may demonstrate an intent to

11  deviate from the ordinary and accustomed meaning of a claim term by including in the

12  specification **expressions of manifest exclusion or restriction, representing a clear disavowal**

13  **of claim scope**." (emphasis added)). Mere criticism of a particular embodiment that falls within

14  the plain meaning of a claim term does not suffice. *Epistar Corp. v. Int'l Trade Comm'n*, 566

15  F.3d 1321, 1335 (Fed. Cir. 2009). "It is likewise not enough that the only embodiments, or all of

16  the embodiments, contain a particular limitation." *Thorner*, 669 F.3d at 1366.

17      Features of particular embodiments described in the specification therefore may not

18  simply be imported into the claims. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341,

19  1347-48 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not

20  limit him to his preferred embodiment or import a limitation from the specification into the

21  claims."); *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1283 (Fed. Cir. 2012) ("The

22  specification need not describe every embodiment of the claimed invention, and the claims should

23  not be confined to the disclosed embodiments—even when the specification discloses only one

24  embodiment[.]").

25      In short, the "claims, not specification embodiments, define the scope of patent protection

26  *Kara Tech. Inc.*, 582 F.3d at 1347:9-13. "The patentee is free to choose a broad term and expect

27  to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines

28  the term or disavows its full scope." *Thorner*, 669 F.3d at 1367.

1

**VOLTERRA'S EXPERT TESTIMONY**

2     As discussed above, the intrinsic evidence—especially the words of the claims

3 themselves—is paramount in claim construction. *See Kara Tech. Inc*, 582 F.3d at 1348 ("[T]he

4 intrinsic evidence and particularly the claim language are the primary resources. . . ."). Extrinsic

5 evidence, such as expert testimony, is generally "less reliable than the patent and its prosecution

6 history in determining how to read claim terms." *Phillips*, 415 F.3d at 1318. For that reason,

7 where the intrinsic evidence "unambiguously describes the scope of the patented invention,

8 reliance on any extrinsic evidence is improper." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

9 1576, 1583 (Fed. Cir. 1996).

10     Crucially, expert testimony "may never be relied upon . . . to vary or contradict the clear

11 meaning of terms in the claims." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir.

12 2003). Yet this is precisely what Volterra attempts to achieve through the testimony of Dr.

13 Thomas Szepesi. As discussed in more detail in the following pages, Dr. Szepesi's restrictive

14 reading of the straightforward terms at issue in this case is contrary to the plain meaning of those

15 terms and their usage in the patent claims and the specification. Indeed, for many of the terms,

16 Dr. Szepesi's opinions are inconsistent even with Volterra's own proposed constructions. The

17 Court should accord no weight to self-serving testimony that attempts to rewrite the patent claims

18 so that Volterra can escape liability for infringement. *See DESA IP, LLC v. EML Technologies,*

19 *LLC*, 211 F. App'x 932, 936 (Fed. Cir. 2007) (unpublished) (expert testimony in conflict with

20 intrinsic evidence should be "accorded no weight").

21     In addition, Dr. Szepesi is not qualified to offer opinions on electronic packaging

22 technology, which is the primary focus of the '730 Patent. Ex. 3, Schaper Reb. Decl. ¶ 3-10. By

23 his own admission, Dr. Szepesi is "not an expert in packaging technology." Ex. 7, Szepesi Sept.

24 17, 2009 Tr. at 436:19-20. Dr. Szepesi's expertise lies in designing integrated circuits as opposed

25 to packaging, as reflected in his CV and prior testimony. Ex. 8, Szepesi July 30, 2009 Tr. 23:19-

26 20 ("I'm an expert inasmuch, as a circuit designer, that's my main experience, circuit design.");

27 Ex. 3, Schaper Reb. Decl. ¶ 4. He never worked as a packaging engineer and has never designed

28 a package for an integrated circuit. *Id.* ¶ 5-6. As such, he fails to qualify as even a person of

ordinary skill in the relevant art for the '730 Patent, much less as an expert in that field.[1]   Ex. 2, Schaper Op. Decl. ¶ 14; Ex. 3, Schaper Reb. Decl. ¶ 3.

**ARGUMENT**

**I.    "metal conductors"**

| Infineon's Proposed Construction | Volterra's Proposed Construction |
| --- | --- |
| plain and ordinary meaning | a first/second part of the final metal layer |

**A.    The term "metal conductor" does not require construction because the term should be given its plan and ordinary meaning—a metal that conducts.**

Claim terms are given their ordinary and customary meaning to one skilled in the art unless the patentee explicitly redefines the term in the specification or clearly disavows the full scope of the term's plain meaning. *Thorner*, 669 F.3d at 1365.  Because neither exception applies here, the term "metal conductor" should be given its plain meaning.

In the context of the '730 Patent, the plain meaning of "metal conductor" is a metal that conducts electricity.  Ex. 2, Schaper Op. Decl. ¶¶ 92-93.  Both sides agree that "metal" is a well-understood term, requiring no further explanation by way of a construction.[2]   Both sides agree that a conductor is something that permits an electric current to flow.  *Id.* ¶ 92; Ex. 6, Szepesi March 24, 2014 Tr. at 53:20-55:23.  Although the Court could construe "metal conductor" to mean "a metal that permits an electric current to flow," no such construction is necessary because this plain meaning is clear from the claim term itself.

Volterra cannot show that either of the two exceptions to plain meaning apply in this case.  First, it is undisputed that the patentee did not act as his own lexicographer by setting out a different definition of metal conductor.  Ex. 3, Schaper Reb. Decl. ¶¶ 54-55; Ex. 6 at 290:12-292:12.  Second, the patentees did not disavow the full scope of the claim term either in the specification or during prosecution.  Ex. 3, Schaper Reb. Decl. ¶ 56.  By its own terms, a "metal

---

[1] By contrast, Infineon's technical expert Dr. Leonard Schaper's area of expertise is electronic packaging.  Ex. 2, Schaper Op. Decl. ¶ 7.  He has 34 years of experience in the field of electronic packaging, has taught graduate courses in electronic packaging, and has contributed chapters to two graduate-level electronic packaging textbooks.  *Id.* ¶¶ 7-8.  He is also a named inventor on numerous patents in the field of electronic packaging, and has received awards from several leading professional organizations for his contributions to that field.  *Id.* ¶¶ 9-11, 17, 25.

[2] Volterra's construction simply incorporates the term "metal" rather than define its meaning.

conductor" is made of metal.  The '730 Patent does not limit a "metal conductor" to any specific type of metal.  Ex. 2, Schaper Op. Decl. ¶ 93.  Similarly, the '730 Patent does not limit a metal conductor by its shape or size.  *Id.*  Nor does the '730 Patent limit a metal conductor based on a method of manufacture.  *Id.*  Thus, a metal conductor may be composed of any type of metal or combinations of metal, in any shape or size, and it may be made using any suitable method of manufacture.  *Id.*

**B.      Volterra's proposed construction should be rejected because it improperly imports limitations inconsistent with the plain meaning of "metal conductor."**

Volterra's proposed construction improperly imports two limitations into the claims.  First, Volterra's construction requires that a metal conductor be a "layer."  Second, Volterra's construction requires that the first and second metal conductors be parts of the same layer.

Volterra's construction improperly confines "metal conductor" to one particular structure—a "layer."  Volterra's Dr. Szepesi describes a layer as a "thin film-like structure."  Ex. 6 at 67:24-69:4; Ex. 9 at 35; Ex. 3, Schaper Reb. Decl. ¶ 70.  Contrary to Volterra's construction, Claim 1 is not limited to a layer; it is written more broadly.  The patentees chose the claim term "conductor," which encompasses structures of a variety of shapes and sizes.  Ex. 2, Schaper Op. Decl. ¶ 95.  Dr. Szepesi implicitly recognizes the breadth of the term when he opines that "metal conductors in power semiconductor devices are **typically** formed as part of a metal layer." Ex. 5, Ex. 5, Szepesi Reb. Decl. ¶ 26 (emphasis added).  Thus, the claim term "metal conductors" encompasses structures other than layers.

The specification of the '730 Patent does not redefine "metal conductor" as limited to thin film-like structures, or any other particular shape or size. Although the specification describes a particular embodiment (Figure 6) in which one metal conductor is made from a metal layer ('730 Patent at 4:20-22), that one embodiment is not sufficient to limit the patentees' broader claim term "conductor" to a layer.  Volterra cannot overcome the plain meaning of "metal conductor" by pointing to an embodiment disclosed in the specification.  *Toshiba Corp.*, 681 at 1369 (Fed. Cir. 2012).  The Federal Circuit has held that even if every embodiment contains a particular features, the claims may be broader, such that the feature is not required.  *Woods,* 692 F.3d at

1283 (Fed. Cir. 2012) ("The specification need not describe every embodiment of the claimed invention, and the claims should not be confined to the disclosed embodiments—even when the specification discloses only one embodiment." (internal citations omitted)); *Thorner*, 669 F.3d at 1366. Volterra's proposed construction is thus unduly narrow.

Similarly, the specification does not support Volterra's proposition that the metal conductors must be parts of the same metal layer. Ex. 2, Schaper Op. Decl. ¶ 98. In this case, Volterra cannot cite to any intrinsic evidence in support of this limitation. With reference to Figure 6, the specification describes the formation of a single metal conductor. The specification does not state or even suggest that the two metal conductors connected to the source and drain regions must be parts of the same layer, much less explicitly redefine or clearly disclaim the scope of "metal conductor" to necessitate such a requirement.

### C. Dr. Szepesi's additional limitations should be rejected because they are inconsistent with the '730 Patent and both sides' proposed constructions.

Volterra's Dr. Szepesi proposes additional, unsupported limitations. For example, Dr. Szepesi proposes that the metal conductor must be composed of aluminum or an aluminum alloy and that the metal conductors cannot include any under-bump metallization (UBM). Ex. 3, Schaper Reb. Decl. at ¶¶ 61-62. Apparently, Volterra rejects these limitations because it did not incorporate them in its proposed construction. The Court should likewise reject these unsupported limitations.

#### 1. The metal conductors are not limited to aluminum.

Dr. Szepesi wrongly contends that Claim 1 requires that the metal conductors be composed of aluminum or an aluminum alloy. His conclusion is inconsistent with the plain and ordinary meaning of the claims. The patentees claimed a "metal" conductor as opposed to an "aluminum" conductor. Ex. 3, Schaper Reb. Decl. at ¶ 63. The patentee did not include in Claim 1 any limitation requiring that the metal conductors be composed of aluminum, an aluminum alloy, or any other particular type of metal. Instead, the patentee broadly claimed the metal conductors to encompass any type of metal. *Id.*; *see Thorner*, 669 F.3d at 1367 ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning

1  unless the patentee explicitly redefines the term or disavows its full scope.").

2      The specification does not redefine "metal conductor" to mean aluminum and does not

3  include any clear disclaimer requiring that the metal conductors be composed of aluminum. The

4  specification does not describe the metal conductors as made of any particular type of metal.[3] Ex.

5  6 at 80:23-82:24. Thus, there is no basis for limiting the metal conductors to any particular type

6  of metal as Dr. Szepesi proposes.[4] Ex. 3, Schaper Reb. Decl. ¶ 64.

7      Dr. Szepesi wrongly contends that the absence of a specific disclosure justifies limiting

8  the claim to what he variously describes as standard, typical, traditional, or usual fabrication

9  processes.[5] Ex. 4, Ex. 4, Szepesi Op. Decl. ¶ 33-34. The '730 Patent "did not explicitly limit the

10 disputed claim language to technologies that were 'conventional' at the time of the invention."

11 *See Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 878-80 (Fed. Cir. 2004) (rejecting

12 argument that "regularly received television signal" was limited to the analog signals that were

13 the dominant format at the time of the invention). Because Claim 1 recites "metal conductor"

14 without limiting it to specific types of metal, the term should be construed to cover all known

15 types of metal. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("[I]f

16 an apparatus claim recites a general structure without limiting that structure to a specific subset of

17 structures, we will generally construe the term to cover all known types of that structure that the

18 patent disclosure supports.") (internal quotation marks omitted)).

19     Moreover, it is undisputed that those skilled in the art knew of metal conductors in

20 integrated circuits made of metals other than aluminum. Dr. Szepesi relies on various prior art

21 textbooks describing aluminum as the "traditional," "typical, "usual," or "preferred" metal used in

---

[3] Dr. Szepesi initially testified that he did not recall whether the specification describes the metal conductor as made of aluminum. Ex. 6 at 80:23-81:3. Later, he admitted that the specification does not specify aluminum or any other type of metal (81:14-15, 82:18-21) and even purported to have relied on this absence of disclosure to limit the claims to aluminum (81:15-18, 82:21-24).

[4] Dr Szepesi testified that the '730 Patent's broad description of "metal" bumps encompasses different types of metals, including those not expressly described in the specification, such as gold. Ex. 6 at 26:14-28:9. Applying this same logic to metal conductors, the term "metal conductor" should be interpreted to encompass different types of metals.

[5] There is no basis to limit Claim 1 to any particular fabrication process, much less a "conventional" or "typical" one. As Dr. Szepesi admits, Claim 1 is directed to a device as opposed to a method of manufacture; Claim 1 does not include any limitations directed to how the device is made. Ex. 6 at 78:22-79:20.

1   "most" integrated circuits.  Ex. 4, Szepesi Op. Decl. ¶ 34.  These descriptions themselves show

2   that those skilled in the art knew that other types of metal could be used and were used in

3   integrated circuits.  Ex. 3, Schaper Reb. Decl. ¶ 65; Ex. 6 at 193:7-199:24.  Moreover, Dr. Szepesi

4   admitted that those skilled in the art in 1996 and 1997 knew of redistribution layers (or RDLs).

5   Ex. 6 at 69:18-23; 70:12-23, 143:21-24.  He further acknowledged that RDLs were usually made

6   of copper, chromium, and gold (*id.* at 141:16-142:9), and these different metal types constitute a

7   single metal layer (*id.* at 142:20-143:8).  In addition, Dr. Szepesi admitted that persons skilled in

8   the art in 1996 and 1997 would have known of UBM, which is a metal layer composed of two or

9   three types of metal and that it can be used as an interface with aluminum or other types of

10   metals.  *Id.* at 71:17-72:7; 98:13-100:8.  He even testified that it was typical to use UBM between

11   aluminum metal pads and solder bumps.  *Id.* at 42:1-8.

12        Thus, those skilled in the art knew that metal conductors in integrated circuit could and

13   did include many different type of metals.  Because the patentees broadly claimed "metal

14   conductors," rather than "aluminum conductors," the term should not be limited to aluminum as

15   Dr. Szepesi proposes.  *See Kara Tech. Inc.*, 582 F.3d at 1348 (expert testimony "cannot overcome

16   the plain language of the claims").

17             **2.      The patentees did not disclaim any portion of the plain meaning of**
                         **"metal conductor" and certainly did not disclaim the use of UBM.**
18
19        Volterra's Dr. Szepesi testifies that the '730 Sicard Patent "teaches against" UBM and that

20   the claims of a patent cannot cover things its specification "teaches against."  Ex. 5, Szepesi Reb.

21   Decl. ¶ 41; Ex. 6 at 141:5-7.  Dr. Szepesi's testimony reveals his fundamental misunderstanding

22   of the proper legal standard for determining whether there is a disclaimer of claim scope.  The

23   phrase "teaching against" relates to assessing the validity of a patent based on the teachings of the

24   prior art.  "A [prior art] reference that properly teaches away can preclude a determination that the

25   reference renders a claim obvious."  *In re Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012).

26   Limiting the scope of the plain meaning of a claim term, by contrast, requires a "clear and

27   unmistakable disclaimer" using "expressions of manifest exclusion or restriction."  *Thorner*, 669

28   F.3d at 1366-67.  As the Federal Circuit has explained, merely "teaching against" a technique is

1  not the same as disclaiming it: "A patentee's discussion of the shortcomings of certain techniques

2  is not a disavowal of the use of those techniques in a manner consistent with the claimed

3  invention."[6] *Epistar Corp.*, 566 F.3d at 1335.

4      Under the correct legal standard, the patentee did not disavow or disclaim any part of the

5  plain meaning of "metal conductor."   In the background of the invention, the specification

6  describes two prior art solutions intended to reduce the resistance of a power device, along with

7  some of their disadvantages: (1) one solution involving the use of multiple parallel wires ('730

8  Patent at 1:32-47) and (2) the other solution involving the use of a thick copper layer and thick

9  aluminum wires (*Id.* at 1:48-52).   The patentees criticized the second solution because the

10  deposition of the thick copper layer increases the complexity, cycle time, and cost of the

11  manufacturing process.  *Id.* at 1:52-55.   That criticism of the prior solution does not meet the

12  "exacting standard" required to disclaim claim scope: "clear and unmistakable disclaimer."  *See*

13  *Thorner*, 669 F.3d at 1366-67 ("Mere criticism of a particular embodiment encompassed in the

14  plain meaning of a claim term is not sufficient to rise to the level of clear disavowal.").

15      The background discussion is not an attempt to show that the invention is patentably

16  distinct from the prior solutions.  Ex. 3, Schaper Reb. Decl. ¶¶ 14, 66.   Indeed, it is readily

17  apparent that those prior solutions are different from the invention because they involve wire-

18  bond interconnections as opposed to "bumps."  *Id.*   As such, those solutions would not even fall

19  within the scope of the claims of the '730 Patent.   The patentees therefore had no need to rely on

20  the thick copper metal layer to distinguish their invention from those solutions.   Rather, in the

21  background, the patentees simply identified some disadvantages of prior solutions.  *Id.*  That the

22  deposition of a thick copper metal layers has some disadvantages in the context of a prior solution

23  does not mean that the patentees expressly disavowed any and all use of copper metal layers in

24  conjunction with the bump-type interconnects of the claimed invention.

25

26  [6] Because teaching against is not the same as disclaimer, Judge Spero's invalidity ruling cited by Dr. Szepesi (Ex. 5, Szepesi Reb. Decl. ¶ 42) does not speak to the relevant legal question.

27  Moreover, Judge Spero's ruling was based on one side's failure to present any contrary evidence rather than a substantive analysis of two sides' evidence and argument.   Ex. 10 at 72

28  ("Defendants do not challenge Dr. Szepesi's opinion that . . . use of a UBM layer would have been inconsistent with an important benefit of Sicard's invention . . . .").

1  Likewise, the specification's teaching that the present invention "does not require" the
2  third thick metal deposition process described in the background of the invention ('730 Patent at
3  5:1-3) by no means clearly disclaims such a process. Stating that a particular process is not
4  required by the invention is very different than forbidding its use in conjunction with the
5  invention. Ex. 3, Schaper Reb. Decl. ¶¶ 15, 67. In other words, the third metal deposition
6  process is optional; the invention can be made either using that process or without using that
7  process. *Id.* That this metal deposition process is optional rather than required is merely a
8  potential advantage of the invention over the prior solution involving the thick aluminum wire.
9  But potential advantages are not claim limitations. *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d
10  1364, 1370 (Fed. Cir. 2003) ("The court's task is not to limit claim language to exclude particular
11  devices because they do not serve a perceived 'purpose' of the invention.").

12  In short, the specification's discussion of a prior solution does not clearly and
13  unmistakably disclaim any of the full scope of metal conductor's plain meaning—not the use of a
14  thick copper layer, and certainly not UBM as Dr. Szepesi contends. Ex. 3, Schaper Reb. Decl.
15  ¶ 16. In fact, as Dr. Szepesi admits, the '730 Patent does not mention or describe UBM at all.
16  Ex. 6 at 98:18-19, 99:1-3, 103:6, 110:9-10. Dr. Szepesi further admits that the thick copper layer
17  discussed in the background is not a UBM, which has an entirely different structure and function.
18  Ex. 6 at 106:3-25; *see also id.* at 107:1-110:14; Ex. 3, Schaper Reb. Decl. ¶¶ 17-23, 68
19  Nevertheless, he relies on the discussion of the disadvantages of the thick copper layer (increased
20  cycle time, complexity, and costs of manufacture) to conclude that the patentee disclaimed the
21  use of any and all structures that might share similar disadvantages, including, in his view, UBM.
22  Ex. 6 at 103:3-106:2, 110:16-111:6; Ex. 5, Szepesi Reb. Decl. ¶ 41. During his deposition, he
23  even suggested that it would be necessary to calculate the time and cost of particular processes
24  and compare them against the disclosed embodiment to determine on a case-by-case basis
25  whether they were within the scope of the claim.[7] The tortured logic required to reach Dr.

---

[7] Dr. Szepesi initially testified that Claim 1 is not limited to a two-layer device as shown in Figure 6 but may encompass a device having any number of layers, including even a ten-layer device. Ex. 6 at 89:12-94:1. These multi-layer devices, however, would have the same disadvantages (increased cycle time, complexity, and costs of manufacture) on which Dr. Szepesi relies to argue that a metal conductor in Claim 1 cannot encompass a UBM. When confronted with this

Szepesi's conclusion belies any argument that this supposed "disclaimer" could possibly be "clear and unmistakable," especially given the ill-defined range of structures that Dr. Szepesi seeks to exclude from the claim.

Dr. Szepesi's argument is nothing more than a thinly veiled attempt to write certain potential objectives or advantages of the invention into the claims. That approach to claim construction is wrong. "An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them." *E-Pass*, 343 F.3d at 1370; *see also Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 832 (Fed. Cir. 2003) (criticizing district court for relying on expert testimony to "limit claim scope based on the purpose of the invention, which is impermissible"). Dr. Szepesi offers no justification for saddling the broad term "metal conductors" with the task of fulfilling every potential advantage described in the specification.

The Court should reject Dr. Szepesi's improper attempt to limit "metal conductors" to a single type of metal and to exclude other structures based on his assessment of their relative advantages. Neither limitation is required by Volterra's proposed construction, and thus neither is properly before the Court. And both are inconsistent with the use of the broad term "metal conductor" in the patent itself, which demonstrates that the term should be given its plain and ordinary meaning as Infineon contends.

## II.    "bump"

| Infineon's Proposed Construction | Volterra's Proposed Construction |
| --- | --- |
| raised metal contact | a raised metal structure formed partially on the final metal layer through an opening of a passivation layer |

inconsistency, Dr. Szepesi tried to change his prior testimony. Ex. 6 at 111:8-137:15. Dr. Szepesi was unable to articulate how much cycle time, complexity, and cost is too much to fall under the claims according to his advantages-based interpretation. He was unable to testify as to whether a sixth layer of a six-layer device may be a metal conductor under his construction. Ex. 6 at 135:4-137:15. He did not know whether such a device would require more or less cycle time than a device with a UBM, calling into question his prior definitive statement that the '730 Patent teaches against UBM. *Id.* at 137:17-23. In the end, Dr. Szepesi was no longer sure whether the '730 Patent teaches against a two-aluminum layer device with a UBM. Ex. 6 at 140:19-23 ("I **think** my answer is . . ." (emphasis added)).

**A.    The term "bump" should be given its plain and ordinary meaning—a raised metal contact.**

"Bump" is a simple term with a straightforward meaning to a person of ordinary skill in the art.  Ex. 2, Schaper Op. Decl. ¶¶ 112-14. Infineon proposes that a bump is a "raised metal contact," and Volterra's construction includes substantially similar language, "raised metal structure."  These alternative wordings do not present a significant substantive dispute.  Volterra's Dr. Szepesi admitted that the two sides' difference was primarily semantic and that he "would have no arguments against" adoption of that portion of Infineon's construction.  Ex. 6 at 222:22-223:2; 226:10-227:1.

As to the parties' slightly different wording, "contact" better comports with the context of the '730 Patent and the understanding of a person of ordinary skill in the art.  The '730 Patent describes the "bumps" as providing an electrical connection.  *See, e.g.*, '730 Patent, 3:13-17, 4:31-33 (stating that "connection portion 54 [of the frame] is in **contact** with the respective bump or bump 8" (emphasis added)).  Volterra's Dr. Szepesi agreed that the bumps in the '730 Patent are "contacts."  Ex. 6 at 224:16-18 ("Q: Can you think of any bumps that are not contacts? A: Not in the context of Sicard.").  Moreover, technical literature from 1996 confirms that Infineon's construction captures the understanding of persons skilled in the art: "Bumping is referred to as the process of adding **raised metal contacts** to bond pads on the die . . . ."  Ex. 12 at 187 (emphasis added); *see also* Ex. 2, Schaper Op. Decl. ¶ 114.

**B.    Volterra's proposed construction should be rejected because it improperly reads a particular method of manufacture into the claims and is inconsistent with the plain meaning of "bump."**

The parties' real dispute centers on the additional language in Volterra's proposed construction, "formed partially on the final metal layer through an opening of a passivation layer."  In the guise of interpreting the straightforward term "bump," Volterra's improperly seeks to read into Claim 1 new elements that are not even recited in Claim 1, such as "final metal layer" and "passivation layer."

Volterra's proposed construction also improperly imports limitations regarding a specific method of manufacture into Claim 1.  In support of its construction, Volterra relies on a portion of the specification describing a method of manufacturing a particular LDMOS embodiment of the

1   invention. Ex. 4, Szepesi Op. Decl. ¶ 45 (citing '730 Patent at 4:24-28); *see generally* '730 Patent

2   at 4:15-37. Volterra's Dr. Szepesi admits that the language in the specification and Volterra's

3   construction describes the step of creating a bump. Ex. 6 at 213:17-214:11. However, Claim 1 is

4   directed to a device as opposed to a method of manufacture and does not include any limitations

5   directed to how the device is made. Ex. 6 at 78:22-79:20. Thus, there is no basis to limit Claim 1

6   to any particular fabrication process. Ex. 3, Schaper Reb. Decl. ¶ 87 Courts must generally take

7   care to avoid reading process limitations into an apparatus claim, *see AFG Industries, Inc. v.*

8   *Cardinal IG Co.*, 375 F.3d 1367, 1372-1373 (Fed. Cir. 2004), because the process by which a

9   product is made is irrelevant to the question of whether that product infringes a pure apparatus

10  claim, *see Vanguard Products Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir.

11  2001) ("A novel product that meets the criteria of patentability is not limited to the process by

12  which is was made.").

13       Moreover, the particular method of manufacture described in Volterra's proposed

14  construction is one of many alternative ways of forming bumps, but Volterra has not shown any

15  explicit redefinition or disclaimer that justifies limiting the plain and ordinary of "bump" to this

16  particular method of manufacture. The specification of the '730 Patent broadly explains that

17  "each bump 8 is formed of a metal, such as copper, or an alloy, such as an alloy of copper, tin and

18  lead." '730 Patent, 2:50-52. Yet Volterra's proposed construction requires that the opening in

19  the passivation define the bump so that the bump is partially on the metal and partially on the

20  passivation as shown in the particular embodiment of Figure 6. Ex. 6 at 202:7-23. A person

21  skilled in the art, however, would have recognized that bumps can be made in many alternative

22  ways. Ex. 2, Schaper Op. Decl. ¶ 116. For example, gold stud bumps can be formed entirely on

23  metal, rather than "through an opening of a passivation layer." *Id.* And some gold stud bumps

24  may even be formed on top of other gold stub bumps—which is neither on a metal layer nor

25  through an opening of a passivation layer. *Id.* ¶ 117. Even Volterra's Dr. Szepesi admits it is

26  possible to place a bump away from any passivation so that the passivation opening does not form

27  or define the shape of the bump as required by Volterra's construction. *Id.* at 202:7-207:3; Ex. 5,

28  Szepesi Reb. Decl. ¶¶ 55-56; Ex. 3, Schaper Reb. Decl. ¶ 88. Thus, a person of skill in the art

1    would have known that bumps made of metal or metal alloys can be formed in ways other than

2    "partially on the final metal layer through an opening in the passivation layer," as Volterra's

3    proposed construction mandates.

4        Volterra can identify no reason for departing from the plain and ordinary meaning of

5    "bump"—a "raised metal contact."  Volterra appears to be relying on the fact that in the example

6    embodiments depicted in Figures 6 and 7, the bump is formed in an opening of a passivation

7    layer.  Ex. 4, Szepesi Op. Decl. ¶ 45-46.  "This is not enough, however, to limit the patentee's

8    clear, broader claims."  *Kara Tech. Inc.*, 582 F.3d at 1347-48.  Those "claims, not the

9    specification embodiments, define the scope of patent protection."  *Id.*  Given the knowledge of a

10   person of skill of many different types of "bumps" and the specification's broad explanation that

11   the "bumps" can be formed of metal or a metal alloy, Volterra's attempt to limit "bumps" to the

12   examples shown in two of the figures runs afoul of well-settled Federal Circuit precedent.  *See,*

13   *e.g.*, *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306-07 (Fed. Cir.

14   2003) ("[T]he mere fact that the patent drawings depict a particular embodiment of the patent

15   does not operate to limit the claims to that specific configuration.").

16       In the parties' prior case, Dr. Szepesi recognized that a claim can be broader than a

17   disclosed embodiment and most of the time is broader.  Ex. 7 at 347:9-13.  Now, however, Dr.

18   Szepesi has changed his testimony (Ex. 6 at 281:2-25) and sought to limit the claim to the

19   disclosed embodiments (*id.* at 203:17-204:2, 204:8-11).  The proper construction is the one that

20   captures the ordinary meaning of "bump" to those skilled in the art—"raised metal contact."

21       **C.    Dr. Szepesi's additional limitations should be rejected because they are**
              **inconsistent with the '730 Patent and both sides' proposed constructions.**

22

23       Volterra's Dr. Szepesi takes an even narrower view of the claims than Volterra does in its

24   proposed construction.  For example, Dr. Szepesi opines that a "bump" cannot be made of solder.

     Ex. 4, Szepesi Op. Decl. ¶ 50.  As an initial matter, the Court should reject these additional

25   restrictions on the claims because Volterra failed to include them in its proposed construction.  If

26   Volterra intended to take the position that "bumps" cannot be made of solder, that should have

27   been part of its proposed construction.

28

Moreover, Dr. Szepesi's view that the "bumps" cannot be made of solder is contrary to the teachings of the specification. The specification says that the "bumps" may be formed of metal or a metal alloy. *See* '730 Patent, 2:50-52. And as Dr. Szepesi admitted at his deposition, solder is a metal alloy. Ex. 6 at 214:13-15. Thus, a person of skill in the art would understand that the specification's description of a "bump" encompasses solder.[8] Ex. 3, Schaper Reb. Decl. ¶ 95. Dr. Szepesi's primary justification for excluding solder—that solder does not form a metallurgical bond with aluminum—rests on his incorrect assumption that the "metal conductors" must be made of aluminum or an aluminum alloy. Ex. 4, Szepesi Op. Decl. ¶ 50. As discussed above in Section I.C.1, however, that is not the case. The patent places no restrictions on the types of metal that may be used to form the "metal conductors." As such, there is simply no basis for limiting the materials that can be used to form the "bump" to exclude solder, which falls squarely within the express teachings of the patent. Ex. 3, Schaper Reb. Decl. ¶¶ 92-99.

## III.    "frame"

| Infineon's Proposed Construction | Volterra's Proposed Construction |
| --- | --- |
| lead frame | a support structure that includes connection portions for connecting to the bumps and other portions for connecting to a PCB |

### A.    The term "frame" should be given its plain and ordinary meaning, which is a lead frame.

The plain meaning of "frame" in the '730 Patent is a lead frame. Because the specification repeatedly explains that the "frame" is a "lead frame" ('730 Patent, 3:17-20, 4:61-62), Volterra does not dispute that the "frame" is a "lead frame." Ex. 4, Szepesi Op. Decl. ¶ 57; Ex. 5, Szepesi Reb. Decl. ¶ 73; Ex. 6 at 241:22-24 ("Q: Do you agree that the frame recited in claim 1 is a lead frame?   A: Yes."); Ex. 2, Schaper Op. Decl. ¶¶ 99-100; Ex. 3, Schaper Reb. Decl. ¶ 72.

---

[8] Indeed, Dr. Szepesi testified in the case before Judge Spero that a person of ordinary skill in the art around the time of the invention would have known that bumps could be formed using solder. Ex. 11, Szepesi Tr. (8/8/2013) at 1110:11-1111:5; *see also* Ex. 3, Schaper Reb. Decl. ¶ 99.

1   "Lead frame" has a well-understood meaning in the art.  Ex. 2, Schaper Op. Decl. ¶ 102;

2   Ex. 3, Schaper Reb. Decl. ¶¶ 73-78.  ████████████████████████████████

3   ████████████████████  *Id; see generally* Ex. 16, Volterra's Assembly Documents.  Thus, there

4   is no need for any other construction of the term.

5       **B.    Volterra's proposed requirement that the frame include "other portions for
            connecting to a PCB" should be rejected because it is inconsistent with the
6            claim language and the specification of the '730 Patent.**

7       The parties' main dispute is whether a frame requires "other portions for connecting to a

8   PCB" as Volterra proposes.[9]

9           **1.    Volterra's construction is inconsistent with Claim 1.**

10      Claim 1 recites that the frame comprises "first connection portions" and "second

11  connection portions," but it does not recite that the frame include any so-called "other portions"

12  as required by Volterra's construction:

13              a **frame** formed of high conductivity material, the **frame**
                comprising a plurality of **first connection portions** for connecting
14              to the at least one bumps of the first metal conductors and a
                plurality of **second connection portions** for connecting to the at
15              least one bumps of the second metal conductors, the **frame**
                providing external connections to the semiconductor regions of the
16              device.

17  '730 Patent, 5:24-30 (emphasis added); *see also* Ex. 2, Schaper Op. Decl. ¶ 108; Ex. 6 at 229:10-

18  18.  Claim 1 states that the frame "comprises" first and second connection portions.  That means

19  that the frame optionally **may** include structures other than the recited connection portions, but it

20  does not **require** any such other structures.  *See, e.g.*, *Vivid Techs., Inc. v. Am. Science & Eng'g,*

21  *Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999) ("'[C]omprising,' . . . is generally understood to signify

22  that the claims do not exclude the presence in the accused apparatus or method of factors in

23  _____

24  [9] The parties also dispute whether the construction of "frame" should include "connection
    portions for connecting to the bumps."  Claim 1 expressly recites separate limitations requiring
25  that the frame include connection portions.  These separately recited limitations should not be
    duplicated in the construction of "frame" because the plain meaning of "frame" does not require
26  the connection portions.  Ex. 2, Schaper Op. Decl. ¶¶ 104-106.  That is precisely why those other
    limitations are recited in the claims.  *Id.* at ¶ 107; Ex. 3, Schaper Reb. Decl. ¶ 79.  There is no
27  need to add redundant language to the construction.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103
    F.3d 1554, 1568 (Fed. Cir. 1997) (Claim construction "is not an obligatory exercise in
28  redundancy," but rather is "a matter of resolution of disputed meanings and technical scope, to
    clarify and when necessary to explain what the patentee covered by the claims.").

addition to those explicitly recited.").

Furthermore, Claim 1 states that the "the frame provides external connections."  Because **any** portion of the frame may provide the external connections, the claim covers embodiments where the connection portions of the frame provide external connections, as well as embodiments where the frame includes other structures that provide external connections.  Ex. 3, Schaper Reb. Decl. ¶ 83.  If the patentees had intended to require that "other portions" of the frame **must** be present and **must** provide the external connections, the patentees would have recited that additional element.  *Id.*  Instead, they selected the more general limitation of "the frame providing external connections."  *Id.*  In addition, the claim does not even mention a PCB—yet another element that Volterra improperly tries to add to the claim through its construction.  Ex. 2, Schaper Op. Decl. ¶¶ 108-109, 111; Ex. 6 at 253:12-24.

> **2.      The specification does not redefine the term "frame" by lexicography or disclaimer to require "other portions for connecting to a PCB."**

Volterra improperly tries to import into Claim 1 a requirement that the frame include "other portions for connecting to a PCB."  Volterra cannot identify any intrinsic evidence showing that the patentees redefined the term "frame" by lexicography or disclaimer to require "other portions for connecting to a PCB."

First, the specification identifies and describes only the connection portions of the frame.  As both experts recognize, the specification uses the terms "connection portion" and "connecting portion" interchangeably to refer to the recited connection portions of the frame.  Ex. 6 at 232:15-233:1; Ex. 4, Szepesi Op. Decl. ¶ 65; Schaper Op. Dec. at ¶ 77.  In contrast, the specification does not even describe what Volterra calls the "other portions" of the frame.  Ex. 3, Schaper Reb. Decl. ¶ 84.  Nor does the specification use any term or name to refer to these "other portions."  Ex. 6 at 236:15-19; *see generally* 232:15-236:19.   The figures include reference numbers for the connection portions of the frame—but not for what Volterra calls the "other portions" of the frame.  Figure 2 shows part of a frame 14, including first connecting portions 16 and second connecting portions 18 (having a width 22).  Figure 3 shows a frame 3 with first connecting portions 16 and second connecting portions 18.  Szepesi Tr. at 239:17-241:8.  Surely if the so-

called "other portions" were as critical to the invention as Dr. Szepesi seems to believe, the patentees would have seen fit to name or describe them.

Because the specification does not even name these "other portions," the specification also does not ascribe to them the function of connecting to a PCB, as provided in Volterra's proposed construction—a fact which Dr. Szepesi admits. Ex. 6 at 236:21-237:11. In fact, the specification does not require that the power semiconductor device be connected to a PCB **at all**. Dr. Szepesi admits that the device could be connected to something else entirely, such as a substrate. Ex. 6 at 253:22-24 ("Q: . . . But could the device be connected to something else besides a printed circuit board? A: Yeah. Could be connected to a substrate."). The specification even describes connecting the device to a "final product" ('730 Patent at 3:27-28), which Dr. Szepesi also admitted could be something other than a PCB (Ex. 6 at 255:7-256:1).

Furthermore, the specification describes the connection portions—not what Volterra calls the "other portions"—as providing the external connections:

- "The first 16 and second 18 **connecting portions** provide an external connection to the drain and source semiconductor regions respectively." '730 Patent at 3:6-8 (emphasis added).
- "The present invention also allows for more efficient heat dissipation through the short, relatively large area (compared to wire bonding) bumps bonded directly to the sources of the heat on the active face of the device, through the metal intensive **connecting portions** of the frame to the product level printed circuit board." *Id.* at 5:4-9 (emphasis added).

*See also id.* at Abstract, 1:60-2:5; Ex. 2, Schaper Op. Decl. ¶ 110; Ex. 3, Schaper Reb. Decl. ¶¶ 84-85.[10]

Given the teachings of the specification that the "connection portions" can provide the "external connections" and the broad language used in the claim, Volterra cannot show that the patentees redefined the term "frame" by lexicography or disclaimer to require "other portions for connecting to a PCB."

---

[10] Thus, Dr. Szepesi's opinions are contrary to the specification. *See* Ex. 4, Szepesi Op. Decl. at 22:26-28 ("[I]t is the other portions of the 'frame' not its 'connection portions' that provide the external connections of the semiconductors regions to the external components e.g. on a PCB.").

IV.     "connection portions"

| Infineon's Proposed Construction | Volterra's Proposed Construction |
|---|---|
| parts of the frame that extend across at least a portion of the die and are spaced apart from one another | portions of the frame for connecting to the bumps |

A.     **The Court should adopt Infineon's proposed construction of "connection portion" because it is the only proposal that clarifies the scope of the claim.**

The parties agree that the connection portions are parts of the frame and extend across a portion of the die, as provided in Infineon's proposed construction.  Schaper Decl. ¶¶ 76-79; Ex. 4, Szepesi Op. Decl. ¶ 57.    The parties' main dispute relates to the "spaced apart from one another" portion of Infineon's construction.  The parties, however, agree on the substantive issue that this language is intended to address.

That substantive issue involves how to distinguish between one connection portion and a plurality of connection portions.  This issue arises from one of the alleged prior art references included in Volterra's invalidity contentions, Japanese Patent Publication No. 5-235086.  Below is a colorized version of Figure 4 from that Japanese Publication.  *See* Ex 13.  According to Volterra's translation, this figure illustrates a lead 23 (colored red)



and several electrode pads 25 (colored blue).   Ex. 14 at 4. Although there is only one lead 23, Volterra appears to take the position that each of the individual electrode pads corresponds to separate "connection portions."   Ex. 15 at 24-25, App'x A-2 to Volterra's Invalidity Contentions ("The reference also discloses that there may be a **plurality** of electrode pad regions (or '**connection portions'**) for each terminal of the chip." (emphasis added)).  Volterra appears to take the position that the single lead 23 can be divided into a plurality of separate connection portions based on the location of electrode pads 25.  Ex. 2, Schaper Op. Decl. at ¶¶ 82-84.  Contrary to the statement in Volterra's invalidity contentions, this single lead 23 is, at most, one connection portion rather than a plurality of connection portions.  It does not make sense to divide the lead

1    into separate "connection portions" based on the location of electrode pads.  Ex. 2, Schaper Op.

2    Decl. at ¶¶ 85-87.

3            Volterra's Dr. Szepesi agrees with Infineon on the substantive scope of "connection

4    regions."  He testified that lead 23 is one connection portion rather than a plurality of connection

5    portions.  Ex. 6 at 268:12-24, *see generally id.* at 264:2-269:19.  He further testified that it would

6    not be "logical" to refer to the separate portions of the lead over each of the pads as separate

7    connection portions.  Ex. 6 at 269:1-19; *see also id.* at 259:21-261:23.  Thus, the parties appear to

8    agree as to the substance.

9            The only dispute relates to which side's construction better captures the parties'

10   substantive agreement that a structure such as the lead 23 is, at most, a single connection portion

11   and cannot be divided into separate connection portions.  Infineon proposes that the connection

12   portion must be "spaced apart from one another."  This description in consistent with Figures 2

13   and 3, which show the connection portions spaced apart from one another.  Ex. 2, Schaper Op.

14   Decl. at ¶ 80.  The patent does not contemplate that a connection portion is limited to the metal in

15   the immediate vicinity of a single bump, instead teaching that one connection portion may be

16   coupled to several bumps. Ex. 2, Schaper Op. Decl. at ¶¶ 85-87.  One connection portion is

17   distinguished from another not based on where the bumps are located, but based on the fact that

18   the two are spaced apart, as illustrated in Figures 2 and 3.  Ex. 3, Schaper Reb. Decl. ¶¶ 49-50.

19   Infineon's construction is necessary to prevent Volterra's approach of arbitrarily carving a single

20   lead into multiple alleged "connection portions."

21           In contrast, Volterra's construction simply restates what is recited in the claim ('730

22   Patent at 5:24-30; Ex. 2, Schaper Op. Decl. ¶ 89) and does not provide any explanation that

23   clarifies that a single strip of metal (such as lead 23 in the Japanese Publication) constitutes, at

24   most, a single connection portion and cannot be divided into separate connection portions.  Claim

25   construction "is not an obligatory exercise in redundancy," but rather is "a matter of resolution of

26   disputed meanings and technical scope, to **clarify and when necessary to explain** what the

27   patentee covered by the claims, for use in the determination of infringement."  *U.S. Surgical*

28   *Corp,* 103 F.3d at 1568 (emphasis added).  Volterra's Dr. Szepesi even testified, "[M]y

1   understanding is that what's clearly expressed in the claim shouldn't be part of—of the claim

2   construction. . . . Because . . . you don't need to clarify [or] explain things which are expressly

3   part of the claim."   Ex. 6 at 176:9-15.   Volterra's construction provides neither necessary

4   explanation nor clarity and, therefore, should be rejected.

5   **V.      "interdigitated"**

| Infineon's Proposed Construction | Volterra's Proposed Construction |
|---|---|
| alternately arranged in adjacent rows | structures of interlocking fingers |

9         Infineon's proposed construction is supported by the intrinsic evidence of the '730 Patent.

10   The term "interdigitated" appears in Claim 2:

> A semiconductor power device according to claim 1
> wherein the plurality of first metal conductors are **interdigitated**
> with the plurality of second metal conductors

13   In this context, the '730 Patent uses the term "interdigitated" to mean alternately arranged in

14   adjacent rows.  With reference to Figure 1, the specification uses those two terms "interdigitated"

15   and "alternating" interchangeably, and even contrasts "interdigitated" metal conductors with

16   "non-alternating" conductors:

> **Alternating** metal conductors 4 and 6 extend over and are coupled
> to drain and source semiconductor regions respectively (not shown)
> of the LDMOS transistor die.  . . .  Moreover, instead of having
> **alternating or interdigitated** metal conductors 4 and 6, the power
> transistor device may have **non-alternating** conductors or even one
> drain conductor only and one source conductor only.

20   '730 Patent, 2:46-62 (emphasis added).   Thus, the specification treats "interdigitated" and

21   "alternating" as synonymous.   Ex. 2, Schaper Op. Decl. ¶¶ 63, 121-22.   And it further

22   distinguishes both from a "non-alternating" arrangement of the metal conductors.  As shown in

23   Figure 1, the interdigitated metal conductors 4 and 6 are alternately arranged in adjacent rows.

24         In contrast, Volterra's construction appears to be based on a generic dictionary definition

25   that does not apply to the '730 Patent.  It is unclear what "interlocking fingers" means in the

26   context of the patent. Ex. 2, Schaper Op. Decl. ¶ 124.  The patent does not describe or illustrate

27   metal conductors that form interlocking fingers.  *Id.* at ¶ 125.  Because it is unclear how this

28

1  construction even applies in the context of the '730 Patent, Volterra's construction would not help

2  the jury but likely confuse them.

3  **VI.   "bumps on the first metal conductors are substantially aligned in first lines which
       extend in a second direction" and "bumps on the second metal conductors are
4       substantially aligned in second lines which extend in the second direction"**

| Infineon's Proposed Construction | Volterra's Proposed Construction |
|---|---|
| plain and ordinary meaning, except for "bumps" as addressed separately in this chart | two-dimensional pattern of bumps where bumps to be connected to the frame are aligned in a direction different from the first direction |

9      **A.      The Claim 5 limitations do not require any further construction.**

10        The Claim 5 limitations do not require construction.  Neither is given any special meaning

11 by the specification, and the meaning of the phrases is clear from the context of the claim

12 language itself.  *See Applied Signal Tech., Inc. v. Emerging Mkts. Comm., Inc.,* No. C 09-2180

13 SBA, 2011 WL 500786, at *2 (N.D. Cal. Feb. 9, 2011) (finding that the "plain and ordinary

14 meaning applies" to a claim term that "is not used in a special manner by the [patent]" and "could

15 be understood by a jury without further construction").  "Direction" and "lines" are ordinary

16 terms that would certainly be familiar to a jury.  Most of the other operative terms, such as "metal

17 conductors" and "bumps," are already before the Court for construction and are addressed above.

18 No further construction of these phrases is necessary for a jury to understand and apply them.

19      **B.      Volterra's proposed construction should be rejected because it incorporates
              limitations inconsistent with the claim language and specification.**
20

21        Volterra's proposed construction is a wholesale rewriting of the claim to include several

22 new, unsupported requirements, such as a "two-dimensional pattern of bumps" and the

23 requirement that the second direction is a "direction different from the first direction."

24        First, neither the claim language nor the specification supports a requirement that the

25 bumps must form a "two-dimensional pattern" of bumps as Volterra proposes.  Ex. 2, Schaper

26 Op. Decl. ¶ 131.  Claim 5 does not mention a pattern of bumps, and the specification does not

27 require that the bumps form any particular pattern.   In fact, the specification expressly

28 contemplates bumps that are not in any particular pattern.  For example, Figure 5 shows bumps

1   that "are arranged **randomly** between the metal conductors 4 and 6." '730 Patent, 3:57-58

2   (emphasis added); Ex. 3, Schaper Reb. Decl. ¶ 102.   Thus, Volterra's proposed construction

3   requiring a "two-dimensional pattern of bumps" would improperly exclude certain disclosed

4   embodiments, including the one illustrated in Figure 5.   *See Vitronics Corp.*, 90 F.3d at 1583-84

5   (holding that an claim interpretation that would exclude a preferred embodiment described in the

6   specification is "rarely, if ever, correct.").

7         Second, neither the claim language nor the specification supports a requirement that the

8   second direction is a "direction different from the first direction," as proposed by Volterra.   The

9   mere fact that certain embodiments depict the first and second directions as different directions

10  does not justify importing that limitation into the claims.   Indeed, the specification includes

11  embodiments in which the first and second directions are the same.   Ex. 3, Schaper Reb. Decl.

12  ¶ 103-105.   Here again, Volterra's proposed construction would improperly exclude these

13  embodiments.

14        Moreover, the doctrine of claim differentiation counsels against reading into Claim 5 a

15  requirement that the second direction is a "direction different from the first direction."   The

16  doctrine of claim differentiation presumes that different claims are intended to have different

17  focus and scope.   *Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a

18  particular limitations gives rise to a presumption that the limitation in question is not present in

19  the independent claim.").   Claim 7, which depends from Claim 5, requires that the second

20  direction is different from the first direction.[11]  Ex. 3, Schaper Reb. Decl. ¶¶ 106.  Importing this

21  requirement into Claim 5 as Volterra proposes would result in the two claims having the same

22  scope.   When, as in this case, the relevant limitation is the only meaningful difference between

23  the two claims, the "doctrine of claim differentiation is at its strongest."   *Liebel-Flarsheim Co. v.*

24  *Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).   Thus, Volterra's proposed construction is

25  presumptively incorrect.

26

27

28  ---
    [11] Claim 7 states, "the second direction is skewed to the first direction."   In the context of the '730
    Patent, "skewed" means not parallel.  Ex. 3, Schaper Reb. Decl. ¶ 106.

C.     **Dr. Szepesi's attempt to read into Claim 5 a requirement that the connection portions be aligned in the second direction is improper and inconsistent with both sides' constructions.**

As with several other terms, Dr. Szepesi takes an even more restrictive view of the claims than Volterra does in its proposed construction.  Although Claim 5 and Volterra's proposed construction discuss the alignment of **bumps** in the second direction, Dr. Szepesi opines that the **connection portions** of the frame must also extend in the second direction.  Szepesi Decl. ¶ 76-81.  But Claim 5 does not include any limitation regarding the direction of the connection portions.  Ex. 6 at 272:14-19.  In fact, Claim 5 does not mention the connection portions or the frame at all.  Although the specification discusses particular embodiments in which the connection portions are arranged in certain directions, there is no justification for importing these limitations into Claim 5, which is silent on this point.  If the patentees had intended to limit the direction of the connection portions, they could have included such limitations.

The doctrine of claim differentiation also counsels against Dr. Szepesi's reading into Claim 5 any requirement regarding the alignment of the connection portions.  Other claims limit the direction of the connection portions, signaling that the patentees knew how to draft limitations such as the one that Dr. Szepesi proposes.  For instance, Claim 9, which depends from Claim 5, requires that the connection portions extend in the second direction: "each of the first connection portions for connecting to the bumps arranged in a respective one of the first lines extending in the second direction and each of the second connection portions for connecting to the bumps arranged in a respective ones of the second lines extending in the second direction."  Claim 9 thus neatly captures the limitation Dr. Szepesi attempts to read into Claim 5.  Ex. 6 at 274:14-275:9.  Under the doctrine of claim differentiation, Dr. Szepesi's attempt to rewrite Claim 5 to include the limitations of its dependent Claim 9 is presumptively wrong.  *See Phillips*, 415 F.3d at 1315.

## CONCLUSION

For the foregoing reasons, the Court should adopt Infineon's proposed constructions, which reflect the plain and ordinary meanings of the disputed claim terms.  Volterra's attempts to use the testimony of its expert and preferred embodiments in the specification to narrow the plain language of the claims should be rejected.

1

2                                                      Respectfully submitted,

3    April 10, 2014

4                                                      By: /s/ David G. Wille
                                                       Jeffery D. Baxter (Pro Hac Vice)
5                                                      David G. Wille (Pro Hac Vice)

6                                                      Baker Botts L.L.P.
                                                       2001 Ross Avenue
7                                                      Dallas, Texas 75201
                                                       Telephone: (214) 953-6791
8

9                                                      Attorneys for Plaintiff
                                                       INFINEON TECHNOLOGIES AG

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28